UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:09-cr-91 |
| | ) | Mattice/Carter |
| CURTIS L. JACKSON | ) | |

REPORT AND RECOMMENDATION

I. Introduction

The defendant's Motion to Suppress (Doc. 18) is before the undersigned Magistrate Judge having been referred by the District Court for a Report and Recommendation pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (C). Defendant Curtis L. Jackson moves to suppress evidence found during a police search of his vehicle on July 25, 2008 on the ground his Fourth Amendment rights were violated when the search was conducted without probable cause following an illegal traffic stop. Defendant also moves to suppress as fruit of the poisonous tree evidence found during a home search at 1312 13th Street conducted that same day. Finally, Defendant moves to suppress evidence found during a police search of his vehicle and person on April 18, 2009 on the grounds that the search was conducted during an illegal detention and arrest following an illegal traffic stop. For the reasons stated herein, it is RECOMMENDED that the defendant's motion to suppress be DENIED.

II. Relevant Facts

An initial evidentiary hearing was held on defendant's motion to suppress in three parts: on September 30, 2009, October 14, 2009, and October 15, 2009. The government presented four witnesses. Defendant did not present evidence. DVD's of both traffic stops were entered into evidence along with documentation of drug dog Xander's training and certification.

*1. Officer Lucas James Fuller*

Officer James Fuller testified to the following: On July 25, 2008, Officer Fuller was a patrol officer with the Chattanooga Police Department (CPD) with three years experience as a law enforcement officer. On the evening of July 25, 2008, at approximately 9:30 p.m., Officer Fuller was conducting a routine patrol in Alton Park in Chattanooga, Tennessee when he observed a car traveling so fast it bounced at the top of a hill.

Falling in behind the car, Fuller had to drive at 41 miles per hour (mph) to keep up with the car, despite the fact that the car had slowed down substantially. The speed limit was 35 mph. Fuller stopped the car on West 38th Street in Chattanooga. Fuller's dash camera with audio, which activated when Fuller turned on his blue lights, recorded the encounter. Defendant was the driver and sole occupant of the gray Dodge Charger, a rental car from Chattanooga hired by a third person. Fuller testified that when a local resident is driving a rental car rented by a third person locally, this is often evidence that the driver is a drug dealer. In Fuller's training and experience, drug dealers will use this tactic to avoid risking their own cars. Fuller became immediately concerned by the extreme level of nervousness displayed by Defendant, including trembling, failure to make eye contact, and slurred speech. Fuller testified defendant "seemed to have cotton mouth." While Fuller was waiting for the driver's license check on Defendant to be completed, Fuller asked Defendant to step out of the car. Fuller expressed his concerns about Defendant's behavior, asking the Defendant if he had swallowed anything that might cause such a severe reaction. All of this happened within five minutes of the stop. Fuller had not yet received a response from computer checks he had requested immediately after his brief initial contact with Defendant.

At 9:38 pm, Fuller asked Defendant if he would consent to a search of the car. Defendant declined. Fuller then conducted a pat down of Defendant's person for safety. He asked Defendant if he could search his person, but Defendant refused consent. Therefore, during the pat down, the officer did not remove what he immediately recognized to be a wad of cash. That wad of cash further aroused Fuller's suspicion. At about 9:39 p.m., Fuller was walking around the outside of the car and using his flashlight to look in the car. Computer checks were completed at 9:40 p.m. Fuller tried to arrange for a drug dog to come to the scene, but there was not a drug dog available.

At approximately 9:42 p.m., Officer Tinney, who had arrived on the scene to back-up Fuller, bent over to smell the area near the front passenger side window. At 9:43 p.m., Tinney told Fuller that he smelled marijuana coming from within the vehicle. Fuller put his head in Defendant's car through the open front passenger side window but was unable to smell the marijuana. Fuller then removed his head from the vehicle and got a breath of fresh air to clear his pallet. Upon putting his head in the vehicle a second time, Fuller was able to smell the marijuana, "by the vents." Fuller had smelled marijuana on numerous prior occasions and was certain that he had detected its odor on this occasion.

At approximately 9:45:35 p.m., Fuller told Tinney that someone on the phone told him it was okay to search the car if they both smelled marijuana coming from the car. The search of the car and the defendant began at 9:45:50 p.m., and a plastic bag containing smaller plastic bags of white powder was found in Defendant's car at 9:47:35 p.m. Approximately $500 in case was found on the defendant's person. At 9:47:49 p.m., Defendant was placed in handcuffs and shortly thereafter was placed in a police car. Police counted the wad of cash at the scene, and it totaled approximately $4,804.

3

### 2. Officer Christopher Lee Tinney

Officer Christopher Tinney testified to the following: On July 25, 2008, the date of the first traffic stop in question, Officer Tinney was a patrol officer with the CPD where he had been employed for almost five years. On the evening of July 25, 2008, at approximately 9:41 p.m., Officer Tinney arrived on the scene to act as backup on Officer Fuller's stop of Defendant. Upon arriving, Tinney walked around Defendant's vehicle looking inside through the windows. At approximately 9:42 p.m. Tinney bent down near the front passenger side window, placing his nose a few inches away from the open window.

Tinney was then able to smell the odor of marijuana coming from the car without placing his nose in the car; however, Tinney could not remember if the marijuana he smelled was burnt or raw. Tinney has smelled marijuana on an almost daily basis in his line of work, he is familiar with the smell of marijuana, and he was very confident that he smelled it on that occasion. Tinney has never had any problems with his sense of smell. At 9:43 p.m. Tinney told Fuller about the marijuana and brought Fuller to the front passenger side window where Fuller smelled the marijuana as well. When he was searching the car, Tinney found marijuana seeds and stems on the floorboard and between the seats.

### 3. Officer Sean O'Brien

Officer Sean O'Brien testified to the following: On April 18, 2009, the date of the second traffic stop in question, Officer O'Brien was a law enforcement officer with the CPD where he had been employed for about two years. Before that, O'Brien was a law enforcement officer with the New Jersey State Police. In the early morning of April 18, 2009, at approximately 12:12 a.m., Officer O'Brien was on patrol traveling east on Blackford Street when he observed a Chevrolet

4

Impala roll through a stop sign without stopping at Willow and Blackford Streets in Chattanooga, Tennessee.

O'Brien activated his lights, and at 12:12:27 a.m., the Impala came to a stop. O'Brien testified the Impala drove a greater distance than normal before stopping and that this often indicates the driver is attempting to hide or retrieve drugs or guns. At 12:12:36 a.m., Defendant stuck both of his hands out of his window, which O'Brien testified is unusual and indicates prior significant dealing with law enforcement. At approximately 12:13 a.m., O'Brien approached Defendant's car and asked Defendant to roll his window down completely. Defendant explained that the window was broken and would not roll down any further, so he opened the car door instead.

O'Brien testified that when Defendant produced a Tennessee driver's license, his left hand shook visibly. Defendant advised the officer that his license had recently been reinstated. Defendant also stated that he had a prior arrest for marijuana but would not maintain eye contact while saying so. O'Brien observed a cigar blunt on the driver's door armrest. O'Brien testified that in his experience most people who smoke marijuana will use a hollowed out cigar blunt to do so at least some of the time. O'Brien asked Defendant where he was going, whether he had any drugs or guns, and why he had a cigar blunt.

At approximately 12:15 a.m., O'Brien asked the Defendant to get out of the car and the Defendant complied. O'Brien observed that the defendant had a number of tattoos, which, in O'Brien's experience, may indicate gang involvement and that the individual is more likely to be armed. When Defendant exited the car, O'Brien asked Defendant questions about his tattoos. The Defendant answered, voluntarily showed the officer his tattoos, and denied that they were gang
5

tattoos. The officer asked the Defendant for consent to search the Impala. The Defendant refused. O'Brien then called for a canine unit on his radio. At this point, O'Brien noticed a drastic change in the Defendant's demeanor, and O'Brien was concerned for his safety.

At approximately 12:17 a.m., O'Brien asked Defendant if he had any weapons, and Defendant put his hand in his left pocket. O'Brien then patted the Defendant down and felt a large fold of cash in his pocket. O'Brien asked what it was. Defendant stared off in the distance and would not answer. Finally the Defendant said, "If you are going to arrest me, arrest me." The officer was now very concerned and there were no other officers at the scene. Therefore, O'Brien handcuffed the Defendant at 12:17:22 a.m. At 12:17:50 a.m., O'Brien explained that he was detaining Defendant because of the unusual answers Defendant was giving and because O'Brien was by himself. At 12:18:50 a.m., Defendant said something about O'Brien taking him to jail, and O'Brien explained that he was not taking Defendant to jail, merely detaining him due to the unusual answers and because O'Brien was by himself.

At 12:19:30 a.m., O'Brien explained to Defendant about the dog that was coming, and Defendant sat on the sidewalk. At about 12:21 a.m., O'Brien asked Defendant if he wanted O'Brien to turn his car off for him. Defendant said he did not, so O'Brien just closed the car door. At 12:24:50 a.m., a police officer was looking through the car windows with a flashlight. At about 12:30 a.m., Officer William Atwell arrived on the scene with a drug dog that sniffed around the outside of the car, eventually alerting to the presence of narcotics. By 12:31:44 a.m., the dog was finished sniffing, and at about 12:33 a.m. the officers began searching Defendant's vehicle. At 12:33:25 a.m., a bag of what appeared to be cocaine, packaged in smaller amounts for resale, was

6

found wedged between the backrest and the seat cushion of the driver's seat. $1095 cash was seized from the Defendant's pocket upon his arrest.

### 4. Officer William Atwell

Officer William Atwell testified to the following: On April 18, 2009, the date of the second traffic stop in question, Officer Atwell was a law enforcement officer with the CPD where he had been for about four and a half years. He was at that time working with the canine unit. In the early morning of April 18, 2009, at approximately 12:30 p.m., Officer Atwell and his drug dog, Xander, arrived on the scene of Officer O'Brien's stop of Defendant.

Upon arriving on the scene, Atwell took Xander around Defendant's car twice to sniff for the odor of drugs. The first search was a free search and the second search was a directed search.[1] Xander alerts to the presence of drugs by sitting down. On both trips around Defendant's car, Xander sat down near the rear driver side door.

Atwell and Xander were certified in October of 2008 by the US Police Canine Association, a recognized training organization. Atwell and Xander had eight weeks of training initially, and they currently train almost every week for seven hours a week. The training consists of hiding drugs in vehicles and buildings and having the dog find them. In April of 2009, Xander was certified in Lowndes County, Georgia. Atwell has a very high degree of confidence in Xander based on his history of correctly alerting on drugs. On cross examination, Atwell admitted that one time Xander had a false positive alert during a training exercise.

---

[1] A free search is where the officer just walks the dog around the car. A directed search is where the officer points out specific locations that the dog should sniff.

III. Analysis

   *A. The June 25, 2008 Search*

As to the June 25, 2008 search, Defendant first argues that the initial stop was invalid. Defendant next argues that he was detained for longer than necessary. Defendant further argues that Fuller lacked sufficient probable cause to search his car. Finally, Defendant argues that evidence found during the search of 1312 13th Street is fruit of the poisonous tree. The undersigned will first review the initial stop, then the length of detention, then probable cause to search the vehicle, and then the search of 1312 13th Street.

The government contends that Defendant was committing a traffic violation in that he was driving at least six miles over the posted speed limit. The government further contends that the length of detention was not too long, and that once Tinney smelled the marijuana, the government had probable cause to search the car. The government admits that evidence found during the search of 1312 13th Street was a fruit of the car search, but denies that the car search was unconstitutional.

   *1. Traffic Stop of Defendant's Vehicle*

When the police have probable cause to believe the driver of a vehicle has committed a traffic violation, they may stop the vehicle. *United States v. Bradshaw*, 102 F.3d 204, 210 (6th Cir. 1996) (so long as the officer has probable cause to believe that a traffic violation has occurred, the resultant stop is not unlawful and does not violate the Fourth Amendment); *United States v. Ferguson*, 8 F. 3d 385, 391 (6th Cir. 1993) (A traffic stop is reasonable if there is probable cause to believe a traffic violation occurred and what else the officer suspected about the driver is irrelevant). Here, Defendant was stopped after Fuller had to drive at 41 mph in a 35 mph zone to

8

keep up with Defendant and had observed defendant driving at an even higher rate of speed. Therefore, I conclude that Fuller had probable cause to make a valid traffic stop of Defendant's vehicle for speeding.

### 2. Length of the Stop

Defendant argues that he was detained for an unreasonable amount of time during the traffic stop thereby violating the Fourth Amendment. A traffic stop includes those normal activities which are routinely carried out during such a stop, *e.g.,* checking the driver's license, registration, and proof of insurance. *See Berkemer v. McCarty*, 468 U.S. 420, 439 (1984); *United States v. Hill*, 195 F.3d 258, 269 (6th Cir.1999). The driver of a vehicle may be detained until after the officer has finished verifying the driver's license and checking other records as these acts are within the purposes of the initial stop. *See United States v. Ellis*, 497 F.3d 606, 613-14 (6th Cir. 2007) (asking for identification and about one's travel itinerary and purpose of travel was appropriate during traffic stop); *United States v. Garrido-Santana*, 360 F.3d 565, 572-74 (6th Cir. 2004) (rejecting defendant's contention that reasonable suspicion was necessary to continue to detain driver after valid traffic stop for speeding in order to conduct computer check of driver's license even though courtesy citation for speeding had already been issued); *United States v. Burton*, 334 F.3d 514, 518-19 (6th Cir. 2003) (asking for consent to search did not unreasonably extend the scope of an ordinary traffic stop); *Hill*, 195 F.3d at 269 (driver's license check, which was completed after citation for traffic offense was issued, was within original scope of traffic stop). Police may also lawfully ask for consent to search and whether the driver possesses contraband during the course of the traffic stop. *See United States v. Palomino*, 100 F.3d 446, 449 (6th Cir. 1996); *United States v. Martinez*, 356 F. Supp.2d 856, 863 (M.D. Tenn. 2005). Moreover, "[a]n

9

officer's inquiries into matters unrelated to the justification for the traffic stop ... do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Arizona v. Johnson*, 129 S.Ct. 781, 788 (Jan. 26, 2009).

Once the purpose of the traffic stop is completed, the officer may not "measurably extend the duration of the stop" unless further information arises to support reasonable suspicion sufficient to justify continued detention. *Id.*; *see also*, *United States v. Perez*, 440 F.3d 363, 370 (6th Cir. 2006); *United States v. Mesa*, 62 F.3d 159, 162 (6th Cir. 1995). In determining whether reasonable suspicion existed to continue the stop beyond its original purposes, this Court must,

> [D]etermine whether an officer formed the requisite reasonable, articulable suspicion during a traffic stop under a "totality of the circumstances" analysis. *See United States v. Erwin,* 155 F.3d 818, 822 (6th Cir.1998) (en banc)*, cert. denied,* 525 U.S. 1123 (1999). This means that we must determine whether the individual factors, taken as a whole, give rise to reasonable suspicion, even if each individual factor is entirely consistent with innocent behavior when examined separately. *See United States v. Sokolow,* 490 U.S. 1, 9 (1989). "Reasonable suspicion is more than an ill-defined hunch; it must be based upon a particularized and objective basis for suspecting the particular person ... of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981). The evidence offered as grounds for reasonable suspicion is to be viewed using a common sense approach, as understood by those in the field of law enforcement. *See Cortez*, 449 U.S. at 417-18; *Hill*, 195 F.3d at 272.

*United States v. Smith*, 263 F.3d 571, 588 (6th Cir. 2001).

Here, about ten minutes expired from the time Fuller initially witnessed Defendant speeding (9:30 p.m.) until the computer record checks on Defendant's license were completed (9:40 p.m.). During that ten minutes, Fuller was waiting on the computer checks, asking Defendant whether he had swallowed anything that might harm him, asking for consent to search and conducting a pat down for officer safety. These are all permissible things to do during a traffic stop, and Fuller did them with all due diligence. Only two minutes then passed between the time the computer checks were completed (9:40 p.m.) and the time Tinney smelled an odor of marijuana coming from the car

10

(9:42 p.m.). Since Fuller had not yet had a chance to write the speeding ticket, this final two minute delay was a reasonable part of the initial traffic stop. Once Tinney smelled the marijuana, there was probable cause to search Defendant's car. Only about five minutes passed between the time probable cause arose (9:42 p.m.) and the time the police found what appeared to be cocaine in Defendant's vehicle (9:47:35). I therefore conclude the defendant was not detained for an unreasonable amount of time during the course of the initial traffic stop.

Even assuming that the period of time between when the record checks were finished (9:40 p.m.) and the time probable cause arose (9:42 p.m.) was not a part of the initial stop, there are numerous specific and articulable facts which, when considered collectively, lead me to conclude that Fuller had reasonable suspicion to believe that criminal activity was afoot. Fuller relied upon Defendant's extreme nervousness, failure to make eye contact, slurred speech, the fact that Defendant was a local resident driving a rental car rented by a third person, as well as the wad of cash felt during the pat down. Even if this information was not sufficient to support probable cause, it was certainly enough to give rise to a reasonable suspicion that criminal activity was afoot. Therefore, using a common sense approach, and considering all the circumstances as a whole, it was reasonable for Fuller to suspect other criminal activity was afoot and to detain the defendant for an additional two minutes while trying to get a drug dog to the scene. *See United States v. Bailey,* 302 F.3d 652, 657-58 (6th Cir. 2002) (officers may continue to detain for investigatory purposes after the original purpose of the traffic stop is completed only if something occurred during the traffic stop to generate the necessary reasonable suspicion to justify further detention); *Hill,* 195 F.3d at 264 (same); *Mesa*, 62 F.3d at 162 (same).

Officer Fuller detained the defendant for only two minutes between the time he finished running the record checks (9:40 p.m.) and the time probable cause arose to search the car (9:42 p.m.). Once probable cause arose, it took about five minutes for the officers to find what appeared to be cocaine. I therefore conclude that the length of the continued detention did not exceed its proper scope under the Fourth Amendment. *See United States v. Avery*, 137 F.3d 343, 350-51 (6th Cir. 1997) (holding detention of 25 minutes before dog sniff reasonable); *United States v. Knox*, 839 F.2d 285, 290-91 (6th Cir. 1988) (holding 30 minute detention for questioning, dog sniff, and consent search reasonable).

### 3. Probable Cause

In *United States v. Crumb*, the Sixth Circuit held that, "the detection of a narcotic's odor, by itself, is sufficient to provide probable cause to conduct a lawful search of a vehicle." 287 F. App'x 511, 514 (6th Cir. 2008); see also *United States v. Foster*, 376 F.3d 577, 588 (6th Cir. 2004) (holding that "when the officers detected the smell of marijuana coming from Foster's vehicle, this provided them with probable cause to search the vehicle without a search warrant"); *United States v. Elkins*, 300 F.3d 638, 659 (6th Cir. 2002) (observing that "[t]his court has held that an officer's detection of the smell of marijuana in an automobile can by itself establish probable cause for a search" ); *United States v. Garza*, 10 F.3d 124, 1246 (6th Cir. 1993) (holding that when an officer smells marijuana coming from a vehicle there is probable cause to search the vehicle). Here, when Tinney smelled marijuana from a position where he was lawfully permitted to be standing (next to the car), he possessed probable cause to search the vehicle. Therefore, I conclude that when Fuller later put his head inside the car and eventually did a full search of the car, there was probable cause to do so, and therefore no Fourth Amendment violation.

### B. Search of 1312 13th Street

Police obtained the search warrant for defendant's residence at 1312 13th Street using evidence seized from the defendant during the June 25, 2008 traffic stop. Since probable cause to obtain the search warrant was based on evidence seized illegally from his vehicle on June 25, 2008, argues defendant, then all evidence found in the subsequent search of his home must be suppressed as fruit of the poisonous tree. *See Wong Sun v. United States*, 371 U.S. 471 (1963). Having concluded that all evidence obtained from defendant's vehicle on June 25, 2008 was obtained lawfully, I therefore conclude that the search warrant for defendant's residence was also valid and thus the evidence found there is not fruit of the poisonous tree.

### C. The April 18, 2009 Searches

As to the April 18, 2009 searches, Defendant seems to argue that Officer O'Brien had no constitutionally valid basis to stop his vehicle. Defendant also argues that O'Brien "had no reason to arrest the Defendant and therefore should not have searched him." Next, Defendant appears to argue that O'Brien prolonged the detention longer than necessary. Finally, Defendant asks the court to determine whether the drug dog was certified and reliable. The undersigned will first review the initial stop, then the search of the defendant's person, then the continued detention, and finally the certification and reliability of the drug dog.

The government contends Officer O'Brien witnessed the driver roll through a stop sign without stopping in violation of Tennessee law. *See* Tenn. Code Ann. § 55-8-149 (requiring drivers to stop at stop signs). The government further contends that O'Brien conducted a pat-down for officer safety and that events during the traffic stop generated the necessary reasonable

13

suspicion to justify detaining defendant while waiting for a drug dog. Finally, the government contends that the drug dog was certified and reliable.

### 1. Traffic Stop of Defendant's Vehicle

The standard for reviewing the constitutionality of the traffic stop in the instant case is succinctly and accurately stated in *Weaver v. Shadoan*, 340 F.3d 398, 407 (6th Cir. 2002):

> Police officers may briefly stop an individual for investigation if they have reasonable suspicion that the person has committed a crime. *Houston v. Clark County Sheriff Deputy John Does 1-5,* 174 F.3d 809, 813 (6th Cir.1999). An ordinary traffic stop is more "akin to an investigative detention rather than a custodial arrest." *United States v. Hill,* 195 F.3d at 264, *cert. denied,* 528 U.S. 1176 (2000). Reasonable suspicion is "more than an ill-defined hunch; it must be based upon a particularized and objective basis for suspecting the particular person . . . of criminal activity." *Houston,* 174 F.3d at 813 (alterations in original) (internal quotations and citation omitted). It requires " 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant' an investigatory stop." *Id.* (quoting *Terry v. Ohio,* 392 U.S. 1, 21 (1968)). Moreover, reasonable suspicion "can arise from evidence that is less reliable than what might be required to show probable cause." *Id.*
>
> The existence of reasonable suspicion must be viewed in the "totality of the circumstances." *United States v. Erwin,* 155 F.3d at 822 ( en banc ), *cert denied,* 525 U.S. 1123 (1999). This means that a court "must determine whether the individual factors, taken as a whole, give rise to reasonable suspicion, even if each individual factor is entirely consistent with innocent behavior when examined separately." *United States v. Smith,* 263 F.3d at 588. Moreover, it is well-settled that the legality of a traffic stop is not dependent upon an officer's subjective intentions. *Whren v. United States,* 517 U.S. 806, 813 (1996).

When police detain a vehicle based on a civil infraction, probable cause is required, but when police detain a vehicle based on a criminal violation, only reasonable suspicion is required. *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008). Here, O'Brien actually saw (and Government Exhibit 2 actually shows) Defendant going through the stop sign at Willow and Blackford Streets in Chattanooga. Tenn. Code Ann. § 55-8-149 provides:

14

Every driver of a vehicle and every operator of a streetcar approaching a stop sign shall stop . . . violation of this section is a Class C misdemeanor.

Therefore, I conclude that, while mere reasonable suspicion would have sufficed, O'Brien had probable cause to make a valid traffic stop.

### 2. Search of Defendant's Person

Defendant argues that O'Brien, "had no reason to arrest the Defendant and therefore should not have searched him." (Doc. 18). Defendant is apparently referring to the point when O'Brien gave him a pat down and placed him in handcuffs. Presumably, Defendant is trying to suppress the wad of cash found on Defendant during the pat-down. Suppressing the wad of cash would detract from the reasonable suspicion O'Brien relied upon in detaining Defendant while awaiting the drug dog.

It is true that an arrest requires probable cause and O'Brien did admit on the stand that he did not have probable cause when he conducted the pat down. However, there are two problems with defendant's argument. First, Defendant was not under arrest when the pat down was made. Indeed, Defendant was not even under arrest when he was placed in handcuffs (which was after the pat down). *United States v. Atchley*, 474 F.3d 840, 849 (6th Cir. 2007) (holding that police may handcuff a suspect as a "safety precaution" even when they are "merely detaining, but not arresting, a suspect") (citing *Houston v. Does*, 174 F.3d 809, 814 (6th Cir.1999)). Second, and more importantly, a Defendant does not need to be under arrest in order for an officer to conduct a pat down for the purpose of officer safety, which is what happened here. *Terry,* 392 U.S. at 27.

Instead, the standard is that an officer may conduct a pat down for officer safety when the officer has reasonable grounds to believe an individual is armed and dangerous. *Id.* Here, when

15

O'Brien activated his lights, Defendant took what O'Brien perceived to be an unusually long time to pull over. O'Brien testified that, based on his training and experience, taking longer to pull over often means that the driver is trying to hide or retrieve drugs or a gun. On the video, Defendant can be seen placing his hands outside the window when he stops. Such behavior is highly unusual, indicates prior significant dealings with law enforcement, and gave O'Brien serious pause. When Defendant handed O'Brien his driver's license, his hands were shaking visibly. Defendant indicated he had a prior arrest for marijuana but would not maintain eye contact while telling O'Brien this. O'Brien observed on the driver's side door a cigar blunt, which he testified is often hollowed out and used for smoking marijuana. O'Brien also observed that the defendant had a number of tattoos, which, in O'Brien's experience, may indicate gang involvement and that the individual is more likely to be armed. When O'Brien called for a canine unit to sniff the car, Defendant's demeanor became more defensive. When O'Brien asked Defendant if he was armed, Defendant put his hand in his pocket and looked away. At that point O'Brien was justifiably nervous about his own safety and he conducted a pat down of defendant. Therefore, I conclude that based on the totality of the circumstances, O'Brien had the requisite reasonable suspicion to conduct a pat down of Defendant.

### 3. Length of the Stop

Defendant argues that he was detained for an unreasonable amount of time during the traffic stop thereby violating the Fourth Amendment. A traffic stop includes those normal activities which are routinely carried out during such a stop, *i.e.* checking the driver's license, registration, and proof of insurance. *See Berkemer*, 468 U.S. at 439; *Hill*, 195 F.3d at 269. The driver of a vehicle may be detained until after the officer has finished verifying the driver's license and

16

Case 1:09-cr-00091-HSM-WBC   Document 44   Filed 10/29/09   Page 16 of 20   PageID #: 86

checking other records as these acts are within the purposes of the initial stop. *See Ellis*, 497 F.3d at 613-14 (asking for identification and about one's travel itinerary and purpose of travel was appropriate during traffic stop); *Garrido-Santana*, 360 F.3d at 572-74 (rejecting defendant's contention that reasonable suspicion was necessary to continue to detain driver after valid traffic stop for speeding in order to conduct computer check of driver's license even though courtesy citation for speeding had already been issued); *Burton*, 334 F.3d at 518-19 (asking for consent to search did not unreasonably extend the scope of an ordinary traffic stop); *Hill*, 195 F.3d at 269 (driver's license check, which was completed after citation for traffic offense was issued, was within original scope of traffic stop). Police may also lawfully ask for consent to search and whether the driver possesses contraband during the course of the traffic stop. *See Palomino*, 100 F.3d at 449; *Martinez*, 356 F. Supp.2d at 863.

Here, it may fairly be said that at the time Defendant was placed in handcuffs and made to wait for the drug dog while sitting on the curb, the initial traffic stop was completed and Defendant was being held for no purpose other than to wait for the drug dog to arrive. Therefore, we will first deal with the reasonableness of the length of the initial stop and then move on to the reasonableness of the length of time Defendant was detained while awaiting the drug dog. About five minutes expired from the time defendant initially stopped his car (12:12:27 a.m.) until Officer O'Brien placed the defendant in handcuffs (12:17:22 a.m.). During that five minutes, O'Brien was checking Defendant's driver's license, asking Defendant about his itinerary, asking for consent to search, and asking if Defendant possessed any contraband. These are all permissible things to do during a traffic stop and O'Brien did them with all due diligence. I therefore conclude the

defendant was not detained for an unreasonable amount of time during the course of the initial traffic stop.

Once the purpose of the traffic stop is completed, the officer may not continue to detain the vehicle or its occupants unless, during the stop, further information arises to support reasonable suspicion sufficient to justify continued detention. *Perez*, 440 F.3d at 370; *Mesa*, 62 F.3d at 162. Therefore, we are left with the question of whether the defendant's continued detention after the traffic stop was completed violated the Fourth Amendment.

In determining whether reasonable suspicion existed to continue the stop beyond its original purposes, this Court must,

> determine whether an officer formed the requisite reasonable, articulable suspicion during a traffic stop under a "totality of the circumstances" analysis. *See United States v. Erwin,* 155 F.3d at 822 (en banc), *cert. denied,* 525 U.S. 1123,(1999). This means that we must determine whether the individual factors, taken as a whole, give rise to reasonable suspicion, even if each individual factor is entirely consistent with innocent behavior when examined separately. *See United States v. Sokolow,* 490 U.S. at 9. "Reasonable suspicion is more than an ill-defined hunch; it must be based upon a particularized and objective basis for suspecting the particular person ... of criminal activity." *United States v. Cortez*, 449 U.S. at 417-18. The evidence offered as grounds for reasonable suspicion is to be viewed using a common sense approach, as understood by those in the field of law enforcement. *See Cortez*, 449 U.S. at 417-18; *Hill*, 195 F.3d at 272.

*Smith*, 263 F.3d at 588.

In the instant case, there are numerous specific and articulable facts which, when considered collectively, lead me to conclude that O'Brien had reasonable suspicion at the time the wad of cash was found to believe that criminal activity was afoot. O'Brien relied upon the facts which gave him reasonable suspicion to conduct the pat down (discussed above), as well as the wad of cash felt during the pat down. While this information may not have been sufficient to support probable cause, it was certainly enough to give rise to a reasonable suspicion that criminal activity was afoot. Therefore, using a common sense approach, and considering all the

circumstances as a whole, it was reasonable for Officer O'Brien to suspect other criminal activity was afoot and to detain the defendant long enough to run the drug dog around the car. *See Bailey,* 302 F.3d at 657-58 (officers may continue to detain for investigatory purposes after the original purpose of the traffic stop is completed only if something occurred during the traffic stop to generate the necessary reasonable suspicion to justify further detention); *Hill,* 195 F.3d at 264 (same); *Mesa*, 62 F.3d at 162 (same).

Officer O'Brien detained the defendant for only thirteen minutes between the time he placed Defendant in handcuffs (12:17:22 a.m.) and the time the drug dog arrived on the scene (12:30 a.m.). This is not an unreasonable amount of time to wait for the drug dog's arrival. *See United States v. Avery,* 137 F.3d 343 (6th Cir. 1997) (detention of gym bag during twenty-five minute wait for drug dog to arrive was reasonable); *United States v. Knox*, 839 F.2d at 290-91 (6th Cir. 1988) (holding 30 minute detention for questioning, dog sniff, and consent search reasonable); *United States v. White*, 42 F.3d 457 (8th Cir. 1994) (one hour and twenty minute detention while waiting for drug dog to arrive was reasonable); *United States v. Bloomfield*, 40 F.3d 910 (8th Cir. 1994) (one hour detention while waiting for drug dog to arrive was reasonable). In each of these cases, *Avery, Knox, White,* and *Bloomfield*, "the police diligently pursued a means of investigation that was *likel*y to confirm or dispel their suspicions quickly" about the defendant. *United States v. Sharpe*, 470 U.S. 675, 686 (1985) (emphasis added). In other words, the length of the detention following completion of the traffic stop in *Avery, Knox, White,* and *Bloomfield*, as well an the instant case, was determined largely by how long it took the drug dog to arrive on the scene to conduct a sniff search.

Once the drug dog was there, it took less than two minutes for the dog to sniff the vehicle and alert. Once the drug dog alerted on the car, probable cause existed to search it. *United States v. Navarro-Camacho*, 186 F.3d 701, 706 (6th Cir. 1999) ("A positive indication by a properly-

trained dog is sufficient to establish probable cause for the presence of a controlled substance"); *United States v. Diaz*, 25 F.3d 392, 393-94 (6th Cir. 1994) (same). I therefore conclude that the length of the continued detention did not exceed its proper scope under the Fourth Amendment.

### 4. Certification and Reliability of Xander

Defendant has requested that the court determine whether Xander, the drug dog, was certified and reliable. Once it is established that a drug dog is certified, evidence of an alert by that dog is admissible, and any other evidence on the subject goes to credibility alone. Certification may be established through testimony or records. *United States v. Boxley*, 373 F.3d 759, 761-62 (6th Cir. 2004); *Diaz*, 25 F.3d at 394. Additionally, "it is not necessary for the government to show that the dog is accurate one hundred percent of the time." *Boxley*, 373 F.3d at 761.

Here, Xander's certification was established by testimony and records. Furthermore, the only evidence Defendant presented on the issue was that one time during training, Xander had a false alert. Therefore, I conclude that Xander was certified and reliable, and that when Xander alerted on Defendant's vehicle, there was probable cause to search the vehicle.

### IV. Conclusion

For the reasons stated herein, it is RECOMMENDED that defendant's motion to suppress (Doc. 18) be DENIED.[2]

Dated: October 29, 2009        s/William B. Mitchell Carter
                               UNITED STATES MAGISTRATE JUDGE

---

[2]Any objections to this Report and Recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 59(b) of the Federal Rules of Criminal Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 142 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive or general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).